IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---

In the matter of: )
ERIC A. McLEAN and DEBORAH D. )
McLEAN, ) Case No. 12-11045
 )
        Debtors. )

---

McLEAN, et al. )
v. ) Adv. No. 13-01008
GREENPOINT CREDIT, LLC, )
et al. )

                         Montgomery, AL
                         October 15, 2013, 1:30 p.m.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Paul J. Spina, III
Yearout, Spina & Lavelle, P.C.
1500 Urban Center Drive
Suite 450
Birmingham, AL 35242

Nicholas H. Wooten
Nick Wooten, LLC
PO Box 3389
Auburn, AL 36831

---

Electronic Recorder
Operator:                          Rhonda King

Transcriber:                       Patricia Basham
                                   6411 Quail Ridge Drive
                                   Bartlett, TN  38135
                                   901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Eric McLean | 6 | 14 | – | – |
| Deborah D. McLean | 22 | 28 | 32 | – |
| Peter L. Dalpiaz | 33 | 46 | 51 | 52 |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|-----|-------------|-----|-----|
| 1 | McLeans v. Medical Center Enterprises Complaint | 16 | 16 |
| 2 | Consent Order | 17 | 17 |
| 3 | Order | 19 | 19 |
| 4 | Letter dated 1-11-13 | 48 | 48 |

1          (CALL TO ORDER)

2          THE COURT: Please be seated.

3          COURTROOM DEPUTY: Adversary case number 13-1008,

4     McLean, et al. versus GreenPoint Credit, LLC, et al.

5          THE COURT: Okay. We will take appearances, first for

6     the plaintiff.

7          MR. WOODS: Your Honor, Nick Wooten for the McLeans.

8          THE COURT: All righty.

9          MR. SPINA: Your Honor, Paul Spina for the defendants.

10          THE COURT: Good afternoon. All right. Well, as you

11     are aware, we are set for trial. I didn't know if you wanted

12     to start with an opening or if you just wanted to start with

13     the evidence. I guess, Mr. Wooten, you are the plaintiff, so

14     I will let you make it your call.

15          MR. WOOTEN: Your Honor, just to make a very brief

16     opening. You reviewed the summary judgment motions. We think

17     they detail most of the facts related to the mechanical aspects

18     of the discharge violation.

19          By way of introduction, Mr. and Mrs. McLean are

20     residents of South Alabama. They live down around New

21     Brockton. Mr. McLean is a disabled veteran, suffers from PTSD.

22     He takes a number of medications related to anxiety,

23     suppression, nightmares, et cetera.

24          When this claim was filed, Mr. McLean was told that

25     his bankruptcy payment was going to double. You will hear

testimony from Mr. McLean of the impacts of the fear that his case was going to double and what impact that was going to have on him and his family's financial condition and how that impacted him based on his condition.

The defense, we think in this case is going to be more or less no harm, no foul. Green Tree says that they offered to withdraw the claim. They have contended throughout that they offered to withdraw the claim before the adversary was filed. I think the evidence is clear that the withdrawal offer did not occur until after the AP was filed. Ultimately Your Honor sustained the objection to the claim. The only problem for my client is he doesn't really understand legal proceedings, so he got that message that the claim – the objection was sustained but he didn't really understand what it meant. So you will find out that he has sort of been under the gun waiting to hear what was going to happen, whether his payments were going to go up and how that was going to impact taking care of his family with his fixed income.

At the end of the day, we believe that it is clear a discharge violation took place here. We believe it did have a significant impact on Mr. McLean's family and we would ask you to make appropriate findings and enter an appropriate award.

THE COURT: Thank you. Mr. Spina.

MR. SPINA: Paul Spina for Green Tree.

As Mr. Wooten stated, the facts really were set forth

1  in the motion for summary judgment and, as our motion for
2  summary judgment stated, the claim was filed and we did have
3  notice of the prior bankruptcy and missed it.  And when we
4  learned of it, as soon as we learned of it, we sent the
5  withdrawal and the objection was sustained, all simultaneously.
6        As we argued in our motion, that is where this matter
7  ended.  Now, today, really for the first time we hear of
8  emotional distress.  As our summary judgment stated, we asked
9  for any proof of damages, any documents to show damages. We got
10  nothing.  Somehow that overcame summary judgment of not proving
11  damages or offering anything to support it, but we are here
12  today and we will again argue that not no harm, no foul, but if
13  they are going to offer something now, we would object to any
14  documents as to their damages because they were not presented
15  to us.
16        I am sorry to make that statement at opening but that
17  is the first we have learned of it other than just a cursory
18  emotional damage claim, but the claim was filed and we did move
19  to withdraw it.  I believe the law is clear that creditors have
20  a right to purge themselves of contempt, and we believe we did
21  so as quickly as the knowledge of the claim being erroneous
22  came about.  We believe this matter ended at the objection to
23  claim and anything after that was not within the debtor's
24  duties to mitigate.
25        THE COURT: All right.  Thank you.

1          Mr. Wooten.

2          MR. WOOTEN: Yes, Your Honor, we call Mr. McLean.

3          (ERIC ALLEN McLEAN, WITNESS, SWORN)

4                    DIRECT EXAMINATION

5   BY MR. WOOTEN:

6   Q.        Mr. McLean, would you state your full name for the

7   court, please?

8   A.        Eric Allen McLean.

9   Q.        And are you currently employed, sir?

10  A.        No, I am disabled.

11  Q.        And how did you become disabled?

12  A.        I was injured while I was in the military in 2001 and

13  subsequently discharged in 2005.

14  Q.        All right.  And did you have some issues related to

15  your disability?  What type of injuries do you still deal with?

16  A.        I deal with a left ankle fusion and post-traumatic

17  stress disorder.

18  Q.        All right.  Do you take medication for your PTSD?

19  A.        Yes, I do.

20  Q.        Can you tell the court about the medications that you

21  take?

22  A.        I take Lithium.  I take Ambien.  I take Klonopin and

23  I take Prazosin.

24  Q.        And do you know your disability rating through the

25  VA?

1    A.        I am ninety percent combined, however they deem me

2    unemployable, so they pay me and I receive benefits at the

3    hundred percent rate.

4    Q.        All right.   Which of these medicines that you

5    mentioned do you take for anxiety?

6    A.        I take the Lithium to help with my temper and mood

7    and I take the Klonopin to help with my nerves.

8    Q.        What do you take Ambien for?

9    A.        To help me sleep at night.

10   Q.        Do you have issues that keep you from sleeping at

11   night related to your PTSD?

12   A.        Yes, I do. I take Prazosin to help with the

13   nightmares but it doesn't always work.

14   Q.        Have you also been found to be disabled through

15   Social Security Disability?

16   A.        Yes, I have.

17   Q.        Are you on a fixed income?

18   A.        Yes, I am.

19   Q.        Did you file bankruptcy in the Middle District in

20   2012?

21   A.        Yes, I did.

22   Q.        Who was your lawyer in that case?

23   A.        Brock and Stout.

24   Q.        All right.  And did you file as a Chapter 13?

25   A.        Yes.

1    Q.        And were your payments for that plan based on your

2    income?

3    A.        Yes.

4    Q.        And what percentage of your debts did you propose to

5    pay back in your plan?

6    A.        It was supposed to be a hundred percent.

7    Q.        Did you have a prior bankruptcy?

8    A.        Yes, I did.

9    Q.        Do you recall when it was?

10   A.        I want to say it was discharged in 2008.

11   Q.        Okay.  Do you remember when you filed it?

12   A.        I want to say around '06.  I had made payments on a

13   13 and then converted to a Chapter 7.

14   Q.        So you converted at some point after a period of

15   time?

16   A.        Yes.

17   Q.        All right.  And was there a debt included in your

18   first bankruptcy to Green Tree?

19   A.        Yes.

20   Q.        All right.  Was it related to a mobile home?

21   A.        Yes, it was.

22   Q.        After you had that discharge, did you have any new

23   debt with Green Tree?

24   A.        No, I did not.

25   Q.        When was the first time you realized that you had a

1    problem with your bankruptcy case in 2012?

2    A.       I want to say the end of November, beginning of

3    December, I received a letter stated that the bankruptcy court

4    was going to double my bankruptcy payments.

5    Q.       Did that surprise you?

6    A.       Yes, it did.

7    Q.       Did you make an inquiry as to why?

8    A.       I did.

9    Q.       What did you find out?

10   A.       That Medical Center Enterprise and Green Tree had

11   submitted bills saying that I owed them money and that was the

12   reason for the increase.

13   Q.       All right.  And were you able to identify the claim

14   that Green Tree made in your case, what it was related to?

15   A.       Yes.

16   Q.       Was it related to your previously discharged debt?

17   A.       Yes, it was.

18   Q.       When you found out about this change, what happened?

19   A.       I called Brock and Stout to find out what was going

20   on and they just said that stuff had been filed and they would

21   have to see what happened.  I was able to get the VA to pay the

22   bill to Medical Center Enterprise but Green Tree still remained

23   saying I owed a debt.

24   Q.       What was going to be the effect on your bankruptcy

25   case if your payments doubled?

1    A.        I couldn't afford it.  I would either have to convert

2    or just not make payments and, either way, I would still lose

3    everything I had.

4    Q.        When you say lose everything you had, was your

5    automobile tied up in this current case?

6    A.        Yes.

7    Q.        What about your furniture?

8    A.        Almost everything in our house was tied up.  We

9    bought all of our furniture from Farmers Furniture, and that

10   was one of the ones included in the bankruptcy.

11   Q.        Was there anything else going on in your life at that

12   point that was causing you additional concerns related to

13   needing to have your vehicle and complete your plan?

14   A.        Starting from September to January, I suffer from

15   what is called the anniversary date of events that occurred

16   while I was stationed in Korea.  It is a very stressful time

17   for me, and I use my vehicle to, you know, get to doctor's

18   appointments and things such as that.

19   Q.        Was your wife also pregnant?

20   A.        We found out New Year's Day that she was pregnant.

21   We had taken tests a couple of weeks prior to that but we

22   weren't for a hundred percent certain until we went to the

23   emergency room.

24   Q.        Were you concerned about your bankruptcy case being

25   dismissed and you losing your vehicle and your belongings?

1    A.         Yes.

2    Q.         What was your reaction to that worry?

3    A.         It caused my symptoms of my PSTD to spike.  I had

4    more frequent nightmares, night sweats.  Just the stress of

5    everything was a lot more than I am used to handling.

6    Q.         And how long did that go on when those symptoms

7    started?

8    A.         For about three or so months.  Normally after things

9    subside in January, it went on for at least another two or

10   three months before, you know, things started to settle down

11   when my step-dad said that, you know, he would help if, you

12   know, the payments doubled or whatever because I was concerned

13   that I don't have any money to buy anything for my kid.  So he

14   said that he would help and, you know, that helped alleviate

15   some of the stress.

16   Q.         So it was a couple of months later when you got some

17   reassurance from family about taking care of it?

18   A.         Yes.

19   Q.         During that time, did you have to increase your

20   medicine?

21   A.         Yes, I did.

22   Q.         Do you have an opinion about how often you had to

23   increase taking your medicines?

24   A.         Normally I would only take my Klonopin if I knew I

25   was going out in public places but, with my nerves, instead of

1    doing that, I was taking it, you know, twice a day to try to

2    keep my nerves down.  I secluded myself to my room and usually

3    that's what I do, try to avoid public and, you know, any type

4    of interaction whatsoever.

5    Q.        So when you say you secluded yourself, can you

6    explain that to the court, what you physically actually do?

7    A.        Basically I go in my room.  I sit in a chair.  I come

8    out long enough to eat and then I go back to my room and I am

9    either listening to music, you know, playing a video game,

10   something to try to take my mind off of everything that is

11   going on.

12   Q.        Are you under a doctor's care for these issues?

13   A.        Yes, I am.

14   Q.        Were you able to get to your doctor in this period of

15   time?

16   A.        No, I was not.

17   Q.        Can you tell the court why you were not able to get

18   to your doctor?

19   A.        My normal psychiatrist got promoted within the VA

20   system and I was told to give it a little while for them to

21   hire a psychiatrist at Fort Rucker, which is closest to me.

22   While that was going on, I was seeking the counsel of my

23   regular doctor who was keeping my medicines refilled and she

24   quit.  So starting about February through I want to say two

25   months ago, I didn't have either a psychiatrist nor a primary

1    care doctor.

2    Q.        So you didn't have a medical professional to turn to,

3    to address these things?

4    A.        No, I did not.

5    Q.        Were you still able to get your medicines?

6    A.        I was.

7    Q.        As far as the frequencies of your episodes, are you

8    able to quantify how frequently these episodes took place after

9    this event?

10         MR. SPINA: Objection, Your Honor.  I am not sure what

11   event we are talking about. If you could clarify, so I know if

12   I object or not.

13         THE COURT: I am going to overrule.  If you feel you

14   need to clarify, you can ask some follow-up questions on cross-

15   exam.

16         Do you recall the question?

17   Q.        After you found out your payments were potentially

18   going to double, do you have any ability to quantify the

19   frequency with which these episodes were occurring?

20   A.        Normally I have nightmares during my anniversary

21   period two to three times a week.  After learning of this, they

22   jumped to four or five times a week.

23   Q.        And how long did that heightened period last?

24   A.        From, I want to say December until somewhere around

25   March to April when everything, you know, settled down.

1    Q.          All right.  Since March or April, you have been

2    pretty much okay?

3    A.          Yes.

4    Q.          Back to your, I guess, normal?

5    A.          Yes.

6                MR. WOOTEN: I tender the witness to Mr. Spina, Your

7    Honor.

8                THE COURT: All right.  Thank you.

9                          CROSS-EXAMINATION

10   BY MR. SPINA:

11   Q.          Mr. McLean, I am Paul Spina and I represent Green

12   Tree.  We have not had the pleasure of meeting, so first of

13   all, thank you for your service, and I know this is a difficult

14   day.  It is always difficult to come to court.  Even us here

15   get nervous being here, so I know you are nervous.  So I will

16   ask questions.  If you don't understand them, please let me

17   know, okay.

18          You listed Green Tree in your first case and then that

19   was discharged, as I understand it, and you also listed the

20   Medical Center that filed a claim; correct, in that first case?

21   A.          Medical Center Enterprise occurred during my second

22   bankruptcy.

23   Q.          Okay.  So they weren't listed in your first case?

24   A.          No.

25   Q.          You filed a lawsuit against them; didn't you?

1    A.        I am sorry.  Southeast Alabama Medical Center was the

2    one that I owed a debt, not Medical Center Enterprise.  I am

3    sorry.  That was my mistake.

4    Q.        Okay.  So the Medical Center, the Southeast Medical

5    Center, that is totally different than Medical Center

6    Enterprises?

7    A.        Yes.  Southeast did a surgery for me in 2011 and,

8    even after I filed for bankruptcy, the VA had still not paid

9    for the surgery and that's where that debt came in.

10   Q.        Distinguish that for me from Medical Center

11   Enterprises that you also filed a lawsuit against.

12   A.        In the first bankruptcy, there were bills that had

13   been discharged and they went and filed a claim for the bills

14   that had been discharged in the first bankruptcy.

15   Q.        And you filed a lawsuit against them in January,

16   right around the same time you filed this lawsuit; right?

17   A.        I am unsure of the dates.  Brock and Stout did the

18   actual filing.

19   Q.        If I show you a copy of that lawsuit, would it

20   refresh your recollection?

21   A.        Sure.

22             (Counsel conferring.)

23             MR. SPINA: Your Honor, we are going to stipulate that

24   Green Tree Exhibit 1 is a copy of a lawsuit filed by the

25   McLeans against Medical Center Enterprises.

1              THE COURT:  Okay.  Was that an adversary proceeding

2      here?

3              MR. SPINA:  It was an adversary proceeding 13-1009.

4              THE COURT: Okay.  Yeah, I have got it right here.

5              MR. SPINA: And we further stipulate it was filed on

6      January 7, 2013.

7              THE COURT: Okay.  Well, I can see that.

8              MR. SPINA: And we offer that complaint as Exhibit 1

9      based on that stipulation.

10              MR. WOOTEN: No objection from plaintiff, Your Honor.

11              THE COURT: All right.  Admitted.

12              MR. SPINA: Your Honor, would you like me to approach

13      with another copy or do you have it there?  Is that sufficient?

14              THE COURT: I have got it right here.  If you want Mr.

15      McLean to look at it.

16              MR. SPINA: We stipulated that it has been filed.  I

17      was going to follow that up with a few more questions.

18              THE COURT: Okay.  Sure.

19      BY MR. SPINA:

20      Q.      Do you recall settling that lawsuit, as well?

21      A.      Yes.

22      Q.      And you recall settling that for two thousand

23      dollars; correct?

24      A.      Yes.

25      Q.      And the basis of that lawsuit was the same as the

1    basis for this one, is that they filed a claim in the discharge

2    case; isn't that right?

3    A.        Yes.

4             (Counsel conferring.)

5             MR. SPINA: Your Honor, we stipulate that Green Tree's

6    Exhibit No. 2 is the consent order entered with regard to that

7    settlement for two thousand dollars.

8             THE COURT: Okay.

9    BY MR. SPINA:

10   Q.        You said you first learned of the Green Tree claim

11   when you got a letter that your payments were going to double?

12   A.        Yes.

13   Q.        Who was that letter from?

14   A.        The bankruptcy court.

15   Q.        And then you called your attorneys about that?

16   A.        Yes.

17   Q.        You said stuff had been filed.  Can you tell me more

18   about that?  Do you know what they filed?

19   A.        No.

20   Q.        Okay.  Do you know that they did object to that

21   claim, to the Green Tree claim?

22   A.        I think I received a letter.  I mean, I get the

23   letters that they send out from the court but I don't know –

24   Q.        You just didn't understand it?

25   A.        No.

1    Q.        Do you know that on January 16 the court entered an

2    order sustaining that objection or, in other words, removing

3    that claim from this case?

4    A.        I got the letter saying it was sustained.  I thought

5    it was like you see on TV where they just mean that it is

6    postponed to a later date.

7    Q.        Did you call your attorney and ask for any further

8    explanation?

9    A.        No.  They said that everything would be taken care

10   of.

11   Q.        So your attorneys told you it was taken care of,

12   don't worry about it?

13   A.        No, they said that they were working on it.  They

14   didn't say don't worry about it.  They just said that they were

15   working on it.

16   Q.        Did you ever receive anything else from the court

17   asking them to raise your payments?

18   A.        No.

19   Q.        Asking you to raise your payments?

20   A.        No.

21   Q.        Did you ever – are you making your payments in the

22   case?

23   A.        Yes.

24   Q.        And you have not had to raise them in any way?

25   A.        Not yet.  I thought that's why we were here.

Q.        We are here because you have sued Green Tree just as

you had sued Medical Center of Enterprises where you settled

for two thousand dollars.  You have filed the same lawsuit here

but the Green Tree claim, as I stated, was taken out on January

16th.  If we could  go back to that order that's already of

record.

        MR. SPINA: Green Tree Exhibit 3, Your Honor, is the –

we would offer Green Tree Exhibit 3, which is the order entered

on January 16.

        THE COURT: Okay.  Admitted.

BY MR. SPINA:

Q.        Your injuries occurred in 2001; is that right?

A.        Yes.

Q.        And I know they are horrific and I would not even

really want to imagine what you went through.  I had a friend

go through something very similar and I saw videos of those

issues, and I can't imagine.  But they have been going on since

that time?

A.        Yes.

Q.        And so they were going on regularly before you ever

filed even your first case?

A.        Yes.

Q.        Did they change when you filed your first case as a

Chapter 13?  Did they increase at any time during that case?

A.        No, because at that time we had payments worked out

1    that I could afford.

2    Q.          How about when that case stopped being a Chapter 13

3    and converted to Chapter 7, did it get worse at that point when

4    that –

5    A.          Yes, it did.

6    Q.          Okay.  So they did worsen when that case was filed?

7    A.          Yes.

8    Q.          Since you learned of this claim by Green Tree in

9    December, they have increased?

10   A.          Yes.

11   Q.          They did not decrease when the claim was taken out of

12   your case in January?

13   A.          I didn't know it had been taken out in January.

14   Q.          They did not – did they increase when you found out

15   that Medical Center Enterprises also filed a claim?

16   A.          No.  When I talked to the lawyer with Medical Center

17   Enterprise, they said that they had already filed something to

18   keep them from being added to my bankruptcy.

19   Q.          Well, you sued them at the same time you filed suit

20   against Green Tree?

21   A.          I don't know when.

22   Q.          Is this case fairly stressful for you?

23   A.          Yes, it is.

24   Q.          Is having a child fairly stressful, in and of itself,

25   if you remove all of the bankruptcy case, isn't it?

1    A.        Yes.

2    Q.        I have three.  I can agree with you.  You don't recall

3    at all anything about the Medical Center Enterprises lawsuit?

4    A.        The only thing I know was stuff was filed that had

5    been previously discharged and Brock and Stout had filed a

6    lawsuit against them for trying to get the same money that had

7    already been discharged in the first bankruptcy.

8    Q.        And that was fairly stressful?

9    A.        That was a couple hundred dollars, not the umpteenth

10   thousand dollars that –

11   Q.        Well, the claim they filed and the lawsuit you filed

12   against them in your name says they filed an eight thousand

13   dollar claim.

14   A.        I don't know how much was on my credit that they tried

15   to go after.  You have to understand, when my PTSD, especially

16   from September to January, I really have no contact with

17   anybody.  I stay secluded in my home as much as possible.  The

18   only thing I get is letters from the bankruptcy court saying

19   that either this has been done or that has been done.

20   Q.        And you have not gotten any other letters saying your

21   payments needed to go up?

22   A.        No.

23   Q.        And you would have received an order that said the

24   objection was sustained, correct?

25   A.        Yes.

1    Q.       And you or your wife are at any time free to contact

2    your attorney to find out what those mean, right?

3    A.       Yes.

4             MR. SPINA: One moment.  (Pause) That is all we have.

5             THE COURT: Mr. Wooten, any redirect?

6             MR. WOOTEN: No, Your Honor.  If I may, I want to call

7    Ms. McLean next and we're going to let Mr. McLean go out and

8    sit with their baby.

9             THE COURT: Okay.  Thank you, Mr. McLean.  You may

10   step down.

11            (DEBORAH DIANE McLEAN, WITNESS, SWORN)

12                       DIRECT EXAMINATION

13   BY MR. WOOTEN:

14   Q.       Ms. McLean, would you state your full name for the

15   court, please?

16   A.       Deborah Diane Maclean.

17   Q.       And are you married to Mr. McLean who was just in

18   here?

19   A.       Yes.

20   Q.       How long have you all been together?

21   A.       Together, we have been together fourteen years now.

22   We will be married fourteen years next month.

23   Q.       Okay.  Are you presently employed?

24   A.       No.

25   Q.       You all have a newborn, don't you?

1    A.       Yes, sir.

2    Q.       And you are taking care of your baby right now?

3    A.       Yes, sir.

4    Q.       Are you trying to get back to work before too long?

5    A.       Yes, sir, I am hoping.

6    Q.       Do you and Eric talk much about your finances?

7    A.       We do discuss finances.  He just doesn't tell me all

8    of his concerns.

9    Q.       Okay.  You were, of course, involved in the decision

10   to file bankruptcy in 2012; right?

11   A.       Yes, sir.

12   Q.       And you were involved in the decision to file

13   bankruptcy in 2006, right?

14   A.       Correct.

15   Q.       When you all filed this bankruptcy, who was the

16   primary money earner in your family?

17   A.       Eric.

18   Q.       Was that because of his disability payments?

19   A.       Yes.

20   Q.       And were you depending – have you been dependent on

21   Mr. McLean's income during this whole case?

22   A.       Yes, sir.

23   Q.       When you all filed this case in 2012, were you making

24   much money working?

25   A.       No.

1    Q.      When is the first time that you became aware that
2    there was a problem with this bankruptcy case?
3    A.      In the last year.
4    Q.      And did you learn what the problem was?
5    A.      Yes.
6    Q.      What did you find out?
7    A.      That our bankruptcy payments were going to more than
8    double and basically we wouldn't be able to afford it.  We
9    would lose everything we have except for hand-me-down
10   furniture.
11   Q.      Okay.  Who told you about that?
12   A.      Eric.
13   Q.      And what did you notice about his disposition, if
14   anything, at that time?
15   A.      He started taking more than normal sleeping pills to
16   help him sleep, more of his anxiety pills to help his nerves.
17   He was real distant.  He really didn't talk to me about it.  I
18   had to basically pry it out of him, you know, what was going
19   on.  Basically he was worried we were going to lose everything
20   we had because we wasn't going to be able to make the
21   bankruptcy payments or default.
22   Q.      You said he was real distant with you.  Is that a
23   trouble sign for you?
24   A.      Yes.
25   Q.      Tell the court about that.

1    A.        He has got PTSD and normally around August to January

2    is his worst months anyways due to his PTSD.  We had lost his

3    mother last year in November on top of finding out about

4    bankruptcy payments doubling and then we found out we were

5    pregnant, and just everything led to not knowing what we were

6    going to do.

7    Q.        And when he told you about the bankruptcy payments,

8    did you notice issues related to that, that you attributed to

9    that concern or worry versus some of these other things that

10   were serious that were going on?

11   A.        Okay.  I am sorry.  What was that again?

12   Q.        When he was telling you about the problem with the

13   bankruptcy case, could you distinguish how that was affecting

14   him versus some of these other things?

15   A.        A difference, yes.  Financially he wasn't wanting to

16   - basically trying to watch everything we spent.  I noticed the

17   end of last year, the beginning of the year, he didn't want to

18   spend too much money, like he was worried about money all of

19   the time, worse than normal.

20   Q.        Did you notice a change in his behavior relating to

21   that?

22   A.        Basically being distant, not wanting to be around

23   anybody more than normal and financially.

24   Q.        Did you notice whether or not he was taking more

25   medicine than he previously did?

1    A.        Yeah,  he  was  taking  more  sleeping  pills  and  the

2    anxiety  pills,  more  than  normal.   Even  for  that  time  of  the

3    year  he  was  taking  more  than  normal,  than  he  normally  does.

4    Q.        Okay.  How  long  did  these  symptoms  last?  How  long  was

5    he  in  this  heightened  state  with  these  issues?

6    A.        I  can't  give  you  an  exact  month  but  it  started

7    settling  down  when  we  found  out  that  the  bankruptcy  payments

8    were  not  going  to  be  doubled.   We  found  out  they  only  went  up

9    by  like  twelve  dollars  is  when  I  noticed  him  starting  to  act

10   normal.

11   Q.        Do  you  recall  when  that  was,  the  first  of  the  year,

12   middle  of  the  year?

13   A.        I  think  it  was  the  middle  of  the  year.

14   Q.        How  did  these  concerns  about  your  bankruptcy  case

15   affect  you?

16   A.        I  just  started  more  or  less  financially  worried  how  we

17   were  going  to  do  it,  how  we  were  going  to  make  it  without  a  car

18   because,  if  we  wasn't  going  to  be  able  to  make  the  bankruptcy

19   payments,  how  were  we  going  to  live,  with  no  furniture,  no  TVs

20   and  basically  nothing.

21   Q.        And  did  you  have  concerns  about  Eric  based  on  what  was

22   going  on?

23   A.        With  his  depression  and  –  yeah,  I  did  because  I  have

24   to  watch  him  anyways  but  it  was  worse.   I  am  sorry,  I'm  –  I  was

25   just  worried  about  him  and  his  mental  state  on  how  we  were

1    going to do everything.

2    Q.      Do you all divide the year by good times and bad times

3    based on his condition?

4    A.      Yes.

5    Q.      And what is the good time of the year normally for you

6    all?

7    A.      Usually from February to August roughly.

8    Q.      Did you notice if his symptoms extended this time into

9    the normally good times of the year for you all?

10   A.      It did.

11   Q.      Do you know what part of the year they were not good

12   anymore?

13   A.      I noticed it lasted until about the middle of the year

14   this year unlike normal, which usually in January, or so, it

15   goes back to normal.  It didn't this past year.

16   Q.      Do you recall when you found out that the payments

17   weren't going to change in your bankruptcy?

18   A.      I don't recall.

19   Q.      Did you and Eric talk about that or did you find that

20   out from some other source?

21   A.      He had a call-in appointment with our lawyer and

22   Enterprise and that is when I found out, when he got off of the

23   phone with them and he told me.

24   Q.      Do you think that was around the middle of the year?

25   A.      I think so.

1          MR. WOOTEN: Ms. McLean, I don't have any further

2     questions for you.  Mr. Spina may have some questions for you.

3                        CROSS EXAMINATION

4     BY MR. SPINA:

5     Q.        Ms. McLean, you are a debtor in – you are in the

6     bankruptcy case along with your husband, right?

7     A.        Correct.

8     Q.        And you are a party to this lawsuit, as well, right?

9     A.        Correct.

10    Q.        And you were a party to the other lawsuit you filed?

11    A.        Correct.

12    Q.        We  have  talked  about  today,  Medical  Center

13    Enterprises; right?

14    A.        I am sorry?

15    Q.        You are a party to that Medical Center Enterprises

16    lawsuit, as well, correct?

17    A.        I am not sure.  I thought that was only in my

18    husband's name.  I don't know.

19    Q.        We have admitted as evidence a lawsuit filed in the

20    name of Eric McLean and Deborah McLean.

21    A.        Okay.  I guess so, then, yes.

22    Q.        Did you even know it was filed?

23    A.        My husband does a lot of the phone calls.  To be

24    honest with you, I was pregnant this past year.  I don't recall

25    – he does all of the emailing and the talking.  I don't – I

1    know we were in another case, yes, but, no, I don't remember.

2    Q.       Okay.  When you became aware of his concerns about

3    financial matters, you are a party to the bankruptcy, do you

4    ever talk to your bankruptcy attorneys?

5    A.       Most of the time, no.

6    Q.       When you saw that your husband was having a concern

7    about the finances and was struggling with his post-traumatic

8    stress issues, you never stepped in and said let me talk to

9    these attorneys and see what is going on?

10   A.       No, because he always takes care of it.  I half of the

11   time don't even understand what is being said when we get the

12   letters in the mail or anything.

13   Q.       Have you ever thought to call your attorney and say,

14   hey, tell me what is going on, you told me you all were taking

15   care of these claims, didn't they take care of it?  You never

16   asked them that?

17   A.       My husband done all of that.

18   Q.       Is there times, especially during his stressful times

19   in August and February when he seems to have more troubles,

20   deservedly so  - well, not deservedly but obvious from what he

21   has said - did you step up and say, you know, let me talk to

22   these attorneys and make sure we're okay?  You never talked to

23   him about that?

24   A.       No, because I don't understand what they say.   I

25   would rather him try to handle it and him know what is being

1   said than me get everything mixed up.

2   Q.       Who told you you were losing everything if the

3   payments went up?  Did the bankruptcy court say they were going

4   to take everything?

5   A.       No, my husband and I discussed bills and there was no

6   way we could afford to make bankruptcy payments if they were

7   doubled, so then we would default, which means we would lose

8   everything we have.

9   Q.       Even though the bankruptcy court took out the Green

10  Tree claim in January, you never thought to talk to your

11  attorney about that or they never talked to you about that,

12  that that took care of the problem?

13  A.       My husband did all of the phone calls.  I don't know.

14  Q.       So really you don't know anything about this case or

15  the lawsuit?

16  A.       I know that Green Tree tried to not – we filed Green

17  Tree on our last bankruptcy and they tried to put it on this

18  bankruptcy, as well.

19  Q.       Just like Medical Center Enterprises?

20  A.       Yes.

21  Q.       That you settled with for two thousand dollars?

22  A.       Yes.

23  Q.       How do you tell the stress caused by Medical Center

24  Enterprises lawsuit compared to the stress by this lawsuit?

25  A.       Because Medical Center Enterprises wasn't going to

1    double our payments because they weren't suing for twenty

2    grand.

3    Q.       Do you have a document showing Green Tree sued you at

4    all or just filed a claim?

5    A.       I guess just filed a claim is what I meant.

6    Q.       Do you have a document showing they sued for twenty

7    grand because the one in the court record is for eleven

8    thousand?

9    A.       There was somewhere in our paperwork – I don't know

10   when – that Green Tree was on there for twenty thousand.  It

11   may have been the last bankruptcy but I remember us discussing

12   twenty thousand dollars.

13   Q.       We are here today on this bankruptcy and this lawsuit

14   and you are saying you don't even know what they were claiming?

15   A.       All I know is they were trying to file it on my

16   bankruptcy.  That is what we pay a lawyer for.  I don't know

17   what else to say.

18   Q.       That lawyer you paid filed an objection to the claim

19   and took out the claim, correct?

20   A.       Do what?

21   Q.       You said you paid a lawyer to handle this and he filed

22   an objection to the Green Tree claim, correct?

23   A.       Correct.

24   Q.       And that claim was taken out of your case on January

25   16, right?

1    A.        I don't know the exact dates on anything.

2    Q.        And your lawyer never told you that?

3    A.        My husband dealt with the phone calls, the emails.

4    I am not sure on exact dates or anything.

5              MR. SPINA: That is all I have, Your Honor.

6              THE COURT: All right.   Any redirect?

7              MR. WOOTEN: Just very briefly.

8                        REDIRECT EXAMINATION

9    BY MR. WOOTEN:

10   Q.        Ma'am, I don't mean to embarrass you.  I know it is a

11   sensitive  subject  but  will  you  tell  the  court  about  your

12   educational background?

13   A.        I did not finish high school.  As of the middle of my

14   eleventh grade year, I didn't finish high school.  Recently I

15   just went and got my GED.  It took me thirteen years to go and

16   get my GED.

17   Q.        And have you been dependent on your husband to take

18   care of financial matters and anything complex?

19   A.        For thirteen years and he has fussed at me about that

20   but I don't handle our business business.  He does it because

21   I don't understand a lot of this that is being done, being

22   said, anything.

23             MR. WOOTEN: Thank you, ma'am.

24             THE COURT: Thank you, ma'am.  You may step down.

25             THE WITNESS: Thank you.

1          MR. WOOTEN: Your Honor, Eric got a little trembly when

2     he went outside a while ago.  If you are okay, I told him he

3     could just stay out in the waiting room.

4          THE COURT: That is fine.

5          MR. WOOTEN: Or she can go back out.  The baby is out

6     there.

7          THE COURT: Yeah, that's fine.

8          MR. SPINA: Do we need a break?

9          MR. WOOTEN: He is all right, I think.  Just poke your

10    head back in here if you need me.

11         MS. McLEAN: Okay.

12         MR. WOOTEN: Your Honor, we would call the Green Tree

13    witness but I just don't know his name.

14         THE COURT: All right.  And what is your name, sir?

15         MR. DALPIAZ: It is Pete Dalpiaz.

16         THE COURT: All right.  We will get the spelling in a

17    minute.

18              (PETER L. DALPIAZ, WITNESS, SWORN)

19                   DIRECT EXAMINATION

20    BY MR. WOOTEN:

21    Q.      Sir, if you will, state your full name for the

22    record, please.

23    A.      Peter Leonard Dalpiaz is my full name.

24    Q.      All right. Can you spell that for the court reporter,

25    please?

1    A.        The last name is "D" as in David, A-L – "P" as in

2    Paul, I-A-Z.

3    Q.        How are you presently employed, sir?

4    A.        I work for Green Tree Servicing.

5    Q.        All right.  How long have you been employed with Green

6    Tree Servicing?

7    A.        Since November 2011.

8    Q.        All right.  And what is your position currently with

9    Green Tree Servicing?

10   A.        Currently I am the litigation representative for the

11   recovery side of the business.

12   Q.        Recovery like collections, right?

13   A.        Charged off debts, yes.

14   Q.        All right.  And what does that job require of you;

15   what is your job description?

16   A.             It  includes  several  aspects  including  risk

17   management  type  duties,  understanding  and  working  with  our

18   compliance department to understand state deficiency laws and

19   working  with  corporate  legal  on  matters  that  start  down  the

20   litigation path.

21   Q.        Okay.  Were  you  involved  in  any  of  the  bankruptcy

22   related  filings  in  this  case?

23   A.        I was not involved in the filings, no, I was not.

24   Q.        And have you ever worked in the bankruptcy department

25   for Green Tree Servicing?

1     A.       No, I have not.

2     Q.       Have you ever had any training on the bankruptcy

3     department for Green Tree Servicing?

4     A.       From the bankruptcy department, no, I have not.

5     Q.       Are you familiar with the bankruptcy process?

6     A.       Somewhat I am, yes.

7     Q.       Tell me if you have had any specialized training

8     related to bankruptcy?

9     A.       No, I have not.

10    Q.       Are you a lawyer?

11    A.       Yes, I am.

12    Q.       When did you graduate from law school?

13    A.       I graduated from law school in May of 2011.

14    Q.       Are you licensed to practice law in any state?

15    A.       The state of Ohio.

16    Q.       Did that occur also in 2011?

17    A.       It did.

18    Q.       Did you take any bankruptcy classes in school?

19    A.       No.

20             MR. SPINA: Your Honor, I'm going to object.  These

21    aren't relevant to the lawsuit here.  He had an opportunity to

22    depose any Green Tree rep he so desired during this case but

23    this is a trial over certain pertinent facts and these

24    questions aren't related to that.

25             THE COURT: Overruled.

1   BY MR. WOOTEN:

2   Q.      I'm sorry, do you remember the last question?

3   A.      I do not.

4   Q.      Okay.  Did you ever take any bankruptcy classes in law

5   school?

6   A.      No, I did not.

7           (Pause)

8           MR. WOOTEN: Your Honor, I thought that all I had to do

9   was cut that light on.  Obviously I was wrong, so I'm just not

10  going to – I don't have anything on the screen.  None of the

11  screens are up.  It looks like the power  – maybe there is a

12  power button.  Okay.  I have got a screen now.  That is just

13  the discharge order from the prior case.

14          MR. SPINA: We can stipulate to that.

15  BY MR. WOOTEN:

16  Q.      All right. So Mr. Spina has stipulated to the entry of

17  the discharge in case number 06-10541, January 8 of 2009.  Do

18  you see that in front of you over there?

19  A.      No.  Do I need to turn something on?

20  Q.      There is a power switch on that button.  I think that

21  might be what is holding us back.  (Pause)

22          So your lawyer stipulated that these documents, this

23  record was entered and you have reviewed your internal company

24  records, right?

25  A.      That is right.

1    Q.      And so you don't dispute that Green Tree got notice of

2    all of these bankruptcy filings and notice of this bankruptcy

3    discharge, right?

4    A.      We were aware of the discharge.

5    Q.      So there was no question about Mr. Hoyt's affidavit

6    about mailing addresses and things like that, that didn't have

7    nothing to do with whether or not Green Tree got notice, right?

8    A.      We were aware of the discharge, that is correct.

9    Q.      Because you all get notice of all of these filings

10   electronically, correct?

11   A.      Yes, that is correct.

12   Q.      Are you familiar with what happens to an account at

13   Green Tree when there is a discharge, what internally Green

14   Tree does to make a notation of a discharge?

15   A.      Yes, I am familiar with that process.

16   Q.      What do they do?

17   A.      The document would be – the standard procedure is that

18   the document would be imaged, that a note would be entered on

19   the account and that it would be given a status code that would

20   reflect the discharge.

21   Q.      So you image the discharge order, correct?

22   A.      That is correct.

23   Q.      And the internal computer records, there is some sort

24   of note or flag about the discharge?

25   A.      Correct.

1    Q.        Then what was the third thing?

2    A.        I think you captured them both there with that second

3    statement that you made.  There is a note and then there is a

4    flag of sorts or a status given to the account.

5    Q.        Have you reviewed this account in Green Tree's

6    records?

7    A.        Yes, I have.

8    Q.        Was the discharge order imaged?

9    A.        Gosh, no, not the order itself.

10   Q.        Was there a note created?

11   A.        That is actually a more complicated question than

12   whether or not there was a note.  There was a software change

13   that occurred in the meantime between the initial bankruptcy

14   and the second bankruptcy and so those notes are not

15   translatable for me in that I don't know what they all mean.

16   Q.        What about for everybody else working at Green Tree,

17   can they tell what they mean?

18   A.        On a short notice basis I was not able to get I guess

19   what you would call a translation on the notes.

20   Q.        What about this flag; is that different than the note?

21   A.        I don't understand the question.

22   Q.        You said that you imaged the order, there is a note

23   put on the account and there is a flag.  The flag and the note

24   are two different things?

25   A.        There is not a flag.  It is a status that is given to

1    the account.

2    Q.      Okay.  So the status?

3    A.      Uh-huh.

4    Q.      And what is the status?  Is that visible on every

5    account when you look at it?

6    A.      Yes.

7    Q.      And what would be the status that you would enter for

8    a discharged debt?

9    A.      It depends on a few different factors, at least there

10   are a few that are possible.

11   Q.      What are those possibilities?

12   A.      Well, that it was discharged.  There is – the type of

13   bankruptcy case that it was would determine which status it

14   gets, whether it was a thirteen or a seven, etc.

15   Q.      So there is a separate status for a Chapter 13

16   discharge versus a Chapter 7 discharge?

17   A.      I believe that is correct, yes.

18   Q.      Are there any other statuses for a discharge?

19   A.      Off of the top of my head, I am not sure.

20   Q.      What about other statuses besides a discharge?  Is

21   there a bankruptcy status?

22   A.      There are several bankruptcy statuses, so I'm not sure

23   what you are asking.

24   Q.      You reviewed the McLeans' account before you came here

25   to testify for Green Tree, right?

1   A.       Uh-huh.

2   Q.       What status did the Green Tree account show for the

3   McLeans' account?

4   A.       Currently off of the top of my head I can't recall

5   what it says.   I looked through all of the details on the

6   account, so –

7   Q.       So is it your testimony that the reason that this

8   second claim was filed was because the software changed?

9   A.       Well, my testimony is there was a mistake made.

10  Q.       Why was the mistake made?

11  A.       Well, if I could tell you that, then the mistake would

12  have been avoided.

13  Q.       You have not been able to determine why the mistake

14  was made by investigating it while this lawsuit was going on?

15  A.       I have not.

16  Q.       Did you have any role in investigating it?

17  A.       I have.

18  Q.       And when did you become involved in investigating it?

19  A.       When it became clear that we would be going to trial.

20  Q.       That was last week?

21  A.       That is correct.

22  Q.       Had you looked at the account before last week?

23  A.       I may have glanced at it but I didn't spend the amount

24  of time that I have in the past week with it.

25  Q.       In the week that you have looked at it, you were not

1    able to determine why a claim was filed in this account?

2    A.      That is accurate.

3    Q.      Do you know the difference between a hundred percent

4    plan and a pot plan in bankruptcy?

5    A.      No, I do not.

6    Q.      If I told you that a hundred percent plan meant that

7    a debtor was going to pay a hundred percent of the allowed

8    claims, would that make sense to you?

9    A.      That would seem reasonable.

10   Q.      Do you know if anybody in Green Tree can interpret the

11   notes and the documents from the previous software system since

12   the software has been changed?

13   A.      I do not know that anyone can.

14   Q.      Have you had other problems similar to this around the

15   country where you filed claims on previously discharged debt?

16   A.      Not to my knowledge.

17   Q.      Do you know how many times Green Tree has been sued

18   for violating the discharge injunction in the last three years?

19   A.      I do not.

20   Q.      Do you have a guess?

21   A.      I wouldn't offer one if I did.

22   Q.      You have been well trained.  Can you tell this court

23   that there is not any way that any older account you might

24   violate the discharge injunction on because the software has

25   changed?

1          MR. SPINA: Objection, Your Honor.  He is taking a

2     deposition here.  None of these facts are relevant.

3          MR. WOOTEN: Your Honor, I think that question is

4     relevant.

5          THE COURT: It is kind of speculative.  Why don't you

6     focus –

7          MR. SPINA: He has equal proof if we have – if we have

8     violated any discharge, he should offer proof if we did it.  He

9     is fishing.

10         THE COURT: Wait a minute.  I thought it was pretty

11    well established that you violated the discharge order.  Is

12    that –

13         MR. SPINA: We have admitted that we filed a claim by

14    mistake by missing the discharge note on this account.

15         THE COURT: Right, and then Mr. Wooten asked some

16    questions as to why the mistake happened, and I think he said

17    something like he didn't know, and I think he is kind of

18    following up.  So, yeah, I think he is – I mean, I think he is

19    entitled to follow up.  The one question you objected to seemed

20    a little bit speculative.  But if he gets a more focused

21    question, I will probably allow it.

22    BY MR. WOOTEN:

23    Q.        Sir, my question really is, as we sit here today,

24    yes, you withdrew the claim after a suit was filed in this case

25    but do you have any information about how frequently this has

1    occurred since the software change?

2    A.          I am not aware of any other ongoing cases.

3    Q.          Have you made any effort to determine if it has

4    occurred?

5    A.          I have not gone, no, looking for other cases.  I

6    haven't.

7    Q.          So you don't know if this is a global problem for

8    Green Tree or not; do you?

9    A.          No, I would disagree with that statement in that I am

10   here today on this claim and that I would be involved in a

11   similar role on any other claim.  And I am not currently

12   involved in any other claim, so I am not aware of any other

13   ongoing cases.

14   Q.          Are you the only person filling this role for Green

15   Tree in the entire country?

16   A.          I am.

17   Q.          Do you have a boss?

18   A.          I do.

19   Q.          And does he handle these claims, as well?

20   A.          He does not.

21   Q.          So you are the only person in the country that

22   handles every one of these discharge claims?

23   A.          No, not a discharge claim but, when it gets to this

24   point where we would potentially be going to trial, I would

25   become involved.

1  Q.        And that is for the purpose of coming to testify;

2  right?

3  A.        Correct.

4  Q.        So how often do you testify for Green Tree?

5  A.        This is the first time that I have actually had to

6  testify.  This is not the first time that I have been involved

7  in litigation.

8  Q.        Have you ever given a deposition?

9  A.        I have.

10  Q.        How many times?

11  A.        That's only, uh, twice actually, that it has actually

12  reached that point.

13  Q.        When did you take on this role where this was your

14  responsibility?

15  A.        I believe it became official in May of 2013.

16  Q.        Five months?

17  A.        That's correct.

18  Q.        What did you do for Green Tree before this?

19  A.        I reviewed accounts for deficiency restrictions based

20  on state law.

21  Q.        Did that have anything to do with bankruptcy?

22  A.        Only to the extent that, if there was an indication

23  on an account that there was a bankruptcy, I would look into

24  that.

25  Q.         It didn't involve working with the bankruptcy

1  department directly?

2  A.        No, sir.

3  Q.        Or being familiar with their day-to-day processes?

4  A.        No, sir.

5  Q.        And all you have learned and testified to today about

6  those processes is something you have been told by other

7  employees of Green Tree; right?

8  A.        With regard to the bankruptcy department process?

9  No, I wouldn't say that.  I mean, the practice with regard to

10 the bankruptcy department is the same as it is with regard to

11 almost any activity on an account.  When something comes in,

12 that document, pleading, whatever it may be, is imaged into a

13 database, a note is added that is relevant to what action has

14 happened with the account and it is given an appropriate

15 status.  That's not something that's specific to the bankruptcy

16 department at all.

17 Q.        With regards to how the bankruptcy department

18 conducts its affairs on a day-to-day basis, anything you are

19 testifying to about that is based off of what you have been

20 told by other Green Tree employees?

21 A.        I am not sure that I testified to anything about

22 their specific day-to-day activities other than the general

23 information I just stated, which applies across all of the

24 departments in the company.

25 Q.        So did you make any inquiry about how the bankruptcy

1   department at Green Tree might be different from what you do on

2   a day-to-day basis?

3   A.        They are not.  I know from a conversation that they

4   would have imaged, they would have added a note and changed the

5   status and that's the standard procedure for bankruptcy, for

6   the role that I had previous to my current role.  That's how

7   the accounts are handled.  That is how they are managed.

8            MR. WOOTEN: I tender the witness, Your Honor.

9            THE COURT: Okay.  Mr. Spina.

10                      CROSS-EXAMINATION

11  BY MR. SPINA:

12  Q.        You were asked questions about a bankruptcy

13  department at Green Tree.  Isn't that somewhat of a misnomer?

14  Aren't there several different areas that may be involved in

15  bankruptcy cases?

16  A.        It is possible that there are multiple entities

17  involved in handling a bankruptcy case.

18  Q.        So not that their procedures are different but you

19  work in recovery; correct?

20  A.        That's correct.

21  Q.        And the way recovery handles these charged off, which

22  are typically deficiencies, is what you know about; correct?

23  A.        That's correct.

24  Q.        And you testified of the standard procedure of

25  notating the account and imaging the discharge order and that

1    something happened in this case and we don't know why?

2    A.        That's correct. There was a mistake made.  I haven't

3    been able to make a determination.   I haven't heard that a

4    determination has been made by anyone else, so –

5    Q.        But we admit that we got notice of the bankruptcy,

6    notated the discharge and, when we learned of this new case

7    through the electronic notice, a claim was filed?

8    A.        That's correct.

9    Q.        After the claim was filed, didn't the notes say that

10   an objection to claim was received?

11   A.        That's correct.

12   Q.        And after that objection was received, wasn't a

13   letter sent to the court asking that the claim be withdrawn?

14   A.        That's correct.

15   Q.        And the objection to claim was received in late

16   December, I believe, and this adversary was filed in January.

17   Isn't that all around the same time, the notice was received

18   all simultaneously?

19   A.        I don't recall the dates off of the top of my head

20   but I know that, after the objection was received, I believe

21   the next review that took place resulted in the withdrawal of

22   the proof of claim.

23   Q.        So the first thing we did, as soon as we received

24   notice, is someone took action to withdraw the claim?

25   A.        Correct.

1    Q.       And it was – saying that that wasn't done until the

2    adversary was filed but the adversary was just filed a few days

3    before that on January 7th.  Do you even show that it was served

4    at that point or only the objection to claim was received?

5    A.       I don't think the adversary proceeding is reflected

6    in the notes before the withdrawal.  I don't believe so.

7    Q.       And the date of that withdrawal was January 11th;

8    correct?

9    A.       That sounds accurate.

10    (Counsel conferring.)

11    MR. SPINA: Your Honor, we stipulate that Green Tree's

12    Exhibit 4, being a letter dated January 11th, it was part of the

13    summary judgment affidavit of Mr. Hoyt and we stipulate and we

14    would offer it as Exhibit 4.

15    THE COURT: Okay. Admitted.

16    MR. SPINA: I believe that is all I have, Your Honor.

17    THE COURT: Okay.  I was just wondering about

18    something.  I am looking at what we call a BNC proof of

19    service.  What happens is we send things out all the time and

20    it's done by BNC.  It is an outfit, I think they are in Reston,

21    Virginia, or someplace like that. And some of the notices get

22    sent out by mail; some get sent out electronically; and I am

23    looking at the BNC notice of service or proof of service and it

24    says it was sent to RMSC dot com.  That's for the Green Tree

25    service.  I mean, I just would have expected, what little I

1  know about emails, I would have expected Green Tree or GT or

2  whatever.  Do you know what that RMSC means?

3        THE WITNESS:  Is there a date reflected on there, as

4  well?

5        THE COURT:  Yes, January 6, 2009.

6        THE WITNESS:  January 6, 2009.  The best I could do

7  is offer a speculation as to what –

8        THE COURT: I mean, I was just wondering what RMSC

9  meant.  What I was wondering is if maybe the notice gets sent

10  somewhere and there's a lag or a delay or a failure but – I

11  would have thought maybe you, working at Green Tree, RMSC, that

12  would be just something you would know off of the top of your

13  head but you are not knowing what it is.

14        THE WITNESS:  RMS?

15        THE COURT: Well, it says RMSC dot com.

16        THE WITNESS:  RMS was the title for the previous

17  software before the software conversion.

18        THE COURT: Okay.

19        THE WITNESS:  That's the best I can do for you

20        THE COURT: Anyway, I was looking down and this is just

21  more entries on the same proof of service in the McLeans' 2006

22  case.  There is also an entry for Walmart Stores, Inc.,

23  Bentonville, Arkansas, and they are showing an address of RMSC

24  dot com, all right.  I mean, I don't know, is there some – I

25  mean, maybe the mistake is on our end.

1       MR. SPINA: Your Honor, I know you are asking questions

2    to my client but I have been involved in trying to investigate

3    that all along, if I may speak?

4       THE COURT: Yes, sir.

5       MR. SPINA: When this was received, that was the first

6    thing I thought because, as the affidavit we filed previously

7    stated, St. Paul -- the physical address was an old address

8    that Green Tree did not use since 2003, and where I thought

9    this was headed was, well, we didn't get notice but those

10   electronic notices are on there.  We tried to investigate.  My

11   client tried to investigate.  We don't know what that address

12   is from 2006 in all candor and probably a few questions from my

13   client would show that those records weren't notated – the

14   records weren't notated as those things coming in on that date.

15      We subsequently learned of the discharge and notated

16   the account and missed it when we filed this claim but not real

17   time, if that makes sense.  We don't have a clue what those

18   notices are.  We couldn't under oath, and I stated this at

19   summary judgment when you had the teleconference and asked this

20   question, we could not under oath say what they are.  We didn't

21   have a clue what they were.  That's why we didn't deny

22   receiving them because the court record shows it but we have no

23   clue what they are and that's why we didn't address it under

24   oath in affidavit.

25      THE COURT: Okay.

1          MR. SPINA: But we did learn of the bankruptcy.

2          THE COURT: Okay.  Well, did anybody else want to ask

3     more questions?

4          MR. WOOTEN: I have just a couple of questions, Your

5     Honor.

6          THE COURT: Okay.

7                    REDIRECT EXAMINATION

8     BY MR. WOOTEN:

9     Q.        Are you able to say to the court what happens when

10    electronic notices are received from the bankruptcy court when

11    they come to Green Tree?

12    A.        No, I am not.

13    Q.        Are you able to say how they come to Green Tree?

14    A.        Other than saying that they come electronically, no,

15    I am not sure where they are directed.

16    Q.        So when you get an electronic notice of a bankruptcy

17    filing, does your electronic system automatically enter it into

18    your software or is that something that is manually done?

19    A.        I am not able to tell you.

20    Q.        But you do know that all of your bankruptcy notices

21    come electronically?

22    A.        Yes.

23    Q.        All right.

24         MR. WOOTEN: Nothing further, Your Honor.

25         THE COURT: Okay.  Mr. Spina.

1            MR. SPINA: Yes, sir.

2                        RECROSS-EXAMINATION

3     BY MR. SPINA:

4     Q.        Once a notice is received and a document such as the

5     discharge order comes in, the process you explained is

6     followed; is that the standard operating procedure?

7     A.        That's correct.

8     Q.        You may not know the technicalities of the email

9     address, which I believe is what was being asked, but once the

10    notice is in hand, the procedures that you documented or

11    testified to are followed?

12    A.        Correct.

13    Q.        Other than a mistake?

14    A.        Correct.

15            MR. SPINA: That's all.

16            THE COURT: Thank you, sir.  You may step down.

17            MR. SPINA: Thank you.

18            THE COURT: Okay.  Gentlemen, is that it?

19            MR. SPINA: Just summary, Your Honor.

20            MR. WOOTEN: That is all of the evidence that we have,

21    Your Honor.  The world's fastest adversary proceeding trial.

22            THE COURT: Why don't you take five minutes and then

23    I will hear closing arguments.

24            MR. WOOTEN: Thank you, Your Honor.

25            (Recess from 2:40 p.m. until 2:52 p.m.)

1           THE COURT: Please be seated.

2           Mr. Wooten.

3           MR. WOOTEN: Your Honor, while we were out, I looked

4     for this RMSC group and I didn't know this was going to be an

5     issue but apparently RMSC is an electronic noticing agency who

6     does this for multiple creditors and they are on the web at

7     Recovery Corp dot com.  They have an extensive website that

8     discusses all of their services and technology and indicates

9     that they provide notices electronically immediately and they

10    handle thousands of transactions a day.

11          So it appears – RMSC is no stranger to me.  I have

12    seen them on electronic noticing for years and I know they

13    serve more clients than simply Green Tree; and I would again

14    state I am under the impression we have stipulated that they do

15    not claim they did not get any of these electronic notices.

16          THE COURT: Right.  No, I guess what I was thinking is,

17    you know, if there is a possibility that something on our end

18    or something on BNC's end contributed to this, I was going to

19    try to follow it up but –

20          MR. WOOTEN: I think Mr. Guerrero would probably say

21    that they are very familiar with RMSC in the technology

22    department and they probably deal with them on a number of

23    fronts.  They appear to emphasize their role in the world of

24    bankruptcy.  It seems to be a major portion of their business

25    although it doesn't appear to be all that they do.

1    With that, Your Honor, I would simply say this: We
2    know from experience that the case law in bankruptcy court is
3    not favorable to emotional damages claims.  The law in all
4    parts of the world seems to be less favorable to emotional
5    damages claim as time goes on.  We would like to see people
6    have these claims verified by doctors and with treatment and
7    records but we are not always able to.

8    And in this case, Mr. McLean testified that he had
9    some problems.  You were able to observe him, his wife, and you
10   will make your decisions about their credibility.  I will say
11   that the law doesn't require corroborating evidence in the form
12   of medical records or doctor's opinions and there are some
13   extenuating circumstances here.  I mean, this is a man with a
14   PTSD problem.  It is obviously very serious and he doesn't like
15   to be around people.  His normal doctors were gone during this
16   period of time.  So even if you give Mr. Spina and Green Tree
17   the benefit of the doubt and you say that he only dealt with
18   this issue from the beginning of December until when the claim
19   was disallowed, that that's reasonable, there is still an
20   emotional damage element to it that quite frankly the kind of
21   things that a discharge injunction and a stay violation are
22   designed to prevent against.

23   You know, I have always struggled my entire career
24   with how do you denominate what is an emotional damage claim
25   worth.  I always, when I stand in front of a jury, I have said

1  it too many times, Judge, I don't know how to tell you because

2  I don't, and it purely is a matter of judgment.  Your Honor has

3  seen all of these cases from every extreme, one to the other,

4  from fleeting emotional claims to very serious emotional

5  claims, and I would never venture to guess what those claims

6  would be worth; but obviously there was some impact here and it

7  was beyond fleeting.

8          The man had to increase his dosage, his period of time

9  that he struggled with these issues was extended.  He had more

10  nightmares.  He had more issues and of course I am sure Mr.

11  Spina will get up and say, well, Your Honor, he had been

12  dealing with this for fifteen years, or twelve years, whatever

13  it was, and that sort of goes back to the old legal theory of

14  the eggshell skull.  You take your plaintiff as you find him

15  and, when you are running a big corporation that is interacting

16  with millions of accounts and you can't explain why something

17  occurred and you don't know after reviewing why it occurred or

18  how it occurred and you run the risk of your processes failing

19  and people being injured because of it, well, you don't get to

20  pick who you injure apparently unless you are malicious and

21  intentional.  So the law doesn't put that burden on the

22  plaintiff, it puts that burden on the defendant.  They have to

23  deal with the plaintiffs that they hurt.

24          If the court finds that an award of damages is

25  appropriate, then also obviously you will have to reach the

1    level of whether or not what was done here rises to the level

2    to award punitive damages and, quite honestly, Your Honor, the

3    part of this case that bothers me is that there has never been

4    anyone who could say why this occurred.  And then today in the

5    testimony, the testimony is, well, we know there are some older

6    notes, we know there is a software change but we don't know

7    anything else.  For all we know, this is a system-wide problem

8    and it is occurring with a great deal of frequency.  It could

9    have been the only time it ever occurred.

10          It would have helped all of us, I think, with a state

11    of mind issue for them to be able to say we identified the

12    issue, it was limited, this is what occurred; it may have

13    happened a couple more times but we have it under control and

14    they just didn't.  And Green Tree is not a creditor that is

15    unfamiliar to this court.  Your Honor is overseeing cases where

16    they violated either the stay or the discharge injunction.

17    Judge Mahoney in the Southern District, Judge Williams, a

18    colleague here.  It is a frequent occurrence.

19          MR. SPINA: I am going to object, Your Honor.  There is

20    no evidence of a frequent occurrence before this court or any

21    other court he referenced.  He could have presented that.

22          THE COURT: Okay.  I am going to take that as argument

23    and let it go at that.  I mean, you are correct, there was no

24    evidence of other wrongs.  He is just making arguments in broad

25    terms.

1          Go ahead, Mr. Wooten.

2          MR. WOOTEN: And, Your Honor, again, this case falls

3   entirely within your discretion.  You will make the decision

4   based on the evidence and we would ask you to make a fair

5   decision based on what has occurred and make an appropriate

6   award in this case.

7          Thank you.

8          THE COURT: All righty.  Thank you.

9          MR. SPINA: Mr. Wooten and I may agree on one thing is

10  that we can agree on – or we may agree on one thing, is that

11  you can't pick who comes in, and I am not going to say that you

12  have to disregard Mr. McLean's condition but I will say that it

13  did exist since 2001; but I am here really to separate, not

14  play on, the emotion of a man who virtually gave his life or

15  gave a very big portion of it for our country from what

16  happened in this case, and I think that is a necessary

17  separation.

18          As I will get to in a moment, since Your Honor did not

19  issue a written order on our summary judgment motion, I would

20  like to – I am not trying to – I need to point out for the

21  record that we still contest those issues, so that the record

22  is clear on –

23          THE COURT: Okay.  Well, the thing is you have admitted

24  that you got the discharge order.  I was a little bit puzzled.

25  Is it your best case scenario, yeah, we violated the automatic

1   stay but we filed the claim and withdrew it within a month or

2   we filed the claim, we withdrew it but, within a couple of days

3   after we withdrew it, the court went ahead and simply sustained

4   --

5          MR. SPINA: And I was going to get to that, Your Honor.

6          THE COURT: The damages were –

7          MR. SPINA: I just wanted the record to reflect still

8   that we hold the position that those cases you disagreed with

9   about that say, when you do not step outside of the bankruptcy,

10  I am not saying – it is one of our arguments and you are right,

11  our best case is what you stated and I will finalize my

12  argument with that, but I just did want to point out for the

13  record those cases again that state, when you never leave the

14  bankruptcy arena and file a claim, those cases that we have

15  cited, Clayton, Surprise, and others, that it does not arise to

16  a 524 violation.  So I don't waive that.  There hasn't been a

17  written order on that, but I just didn't want the court to

18  think we had waived that argument.

19         But back to what the court did say.  Our best case is

20  and it is what I was going to finish with, we did act as soon

21  as we learned.  You heard the testimony.  We tried to

22  investigate it.  We don't know what the mistake is.  As my

23  client stated, if you know where the mistake is, usually you

24  can prevent it.  We do admit we got notice.  As the testimony

25  was, it came after.  It wasn't real time notice with the

bankruptcy, prior bankruptcy filings, it was afterwards that we learned of it and made the notes.  We knew of it.  We have never hidden from that fact but the moment we learned of it, we –

THE COURT: You have got to admit it is kind of ironic that you got notice in the '06 case where you discharged and yet you went ahead and acted in the 2012 case where you weren't even given notice.

MR. SPINA: Well, I believe our notice came after we got the – we knew about the bankruptcy case.  I don't know – I can't say, as an officer of the court, when we got it, how we got it.  We believe we got it –

THE COURT: Yeah, right.  No, no, I –

MR. SPINA: And the evidence wasn't presented but we know we got it.

THE COURT: But the thing is, I mean it looks like Green Tree is running around sort of trolling through huge amounts of data and they found the 2012 filing. They found it somehow on their own because BNC didn't send Green Tree a copy of the notice of filing in the 2012 case; did they?

MR. SPINA: It came immediately on filing, the night after the bankruptcy case filed, the electronic notice comes – not through the BNC.  As we stated in our affidavit, through a Social Security number scrub and notice of this second bankruptcy came in.  That's in the affidavit of Herschel Hoyt.

1   Once that notice was received, we filed the claim and that's
2   when we made the mistake of missing the prior discharge. But
3   as soon as we learned of the mistake – and I think, as we
4   stated, that is an argument – we acted on it. This is not a
5   case where Your Honor's prior – a lot of Your Honor's prior
6   decisions state that you have sanctioned people when a debtor's
7   attorney may write several letters saying, look, this
8   bankruptcy has been filed, you need to correct what you are
9   doing, or this debt was discharged, you need to withdraw this
10  claim. There's letters, there are some warnings.

11          Here, an objection was filed on December 13 and the
12  adversary proceeding filed on January 7th and, as soon as we
13  learned of those things, we withdrew the claim. Do I stand
14  here and say it eliminated every issue, you know, would I wish
15  they could have withdrawn – not filed a claim, of course, but
16  as counsel pointed out, when you deal with thousands of claims,
17  a claim is going to get missed. In most cases, there is that
18  letter or a phone call.

19          Green Tree is well represented in this court by Mr.
20  Math and everybody knows he is Green Tree's lawyer in this
21  court. No phone call was made to him, no letter was sent to
22  him, no warning shot. The only thing we got was the objection
23  and we acted on it immediately.

24          THE COURT: Okay. Well, I will – I mean, granted,
25  usually the most egregious case is where there's a pattern of

1  conduct, the creditor is doing bad things, debtor's lawyer

2  writes a letter and says, look, the client is in bankruptcy,

3  leave him alone.  The creditor says, oh, to heck with you, I am

4  going to go ahead and keep hassling.  I mean, I agree, we don't

5  have that here.

6       MR. SPINA: So it gets down to what was the effect of

7  that.  There are numerous decisions.  Decisions from the Middle

8  District Bankruptcy Court, decisions from the Middle – the

9  District Court that say the bankruptcy attorney is hired to

10  handle those things and the bankruptcy attorney in this case

11  filed an objection to claim on December 13th.  Sometime – they

12  could not pinpoint – around the time the debtors learned that

13  they have to increase their – were going to have to increase

14  their payments.  Why they didn't act before then, I don't know,

15  but they acted on it and that claim was taken out on January

16  11th.  The claim didn't last in this case – that process lasted

17  less than thirty days.  The attorney that they paid to handle

18  it handled it and, one, we think the order on objection to

19  claim has *res judicata* effect, and we raised that in our

20  summary judgment.

21       THE COURT: Yeah, explain that to me.  I don't

22  understand that.

23       MR. SPINA: Well, that's when this issue was before the

24  court.  The parties are identical. The issue was identical.

25  It's the same claim.  It is all about the same claim.  There's

1  no other acts.   Had they stated that we went outside the

2  bankruptcy court and sent the man letters or filed suit, we

3  would be dealing with a different matter than an objection to

4  claim.  But they filed an objection to claim and litigated it

5  before this court and the order – it was taken out, and I

6  believe that is a final order that should be given *res judicata*

7  effect.  And so we believe that ended it.

8       They will argue that they had to file the adversary

9  proceeding, too, but the only thing they did in this adversary

10  was file the complaint before that claim was taken out and,

11  again, it ended it.

12       Now, they testified that Mr. McLean worried for months

13  after that but they have an attorney who files thousands of

14  cases in this court, and the fact that nobody talked to him,

15  they knew his condition, they knew his worrisome nature.  They

16  knew that – I mean, he has stress issues that they were well

17  aware of when they filed this case.  They filed numerous debt

18  claims in this case of medical expenses. The testimony was

19  their attorney never told them that it was taken care of.

20       They want us to pay for the worrying for months and

21  months and months after the claim was done away with, and you

22  heard the testimony, Mr. McLean thought we were here today to

23  deal with the claim of Green Tree.  Ms. McLean didn't even know

24  how much it was.

25       The claim was filed admittedly and dealt with in

1    January and wiped out.  Green Tree asked that it be removed as

2    soon as they learned of the objection and we think it – we are

3    not saying no harm, no foul, as Mr. Wooten stated, but the

4    attorney, as the cases say – I think Judge Williams' *Sims* case

5    and even the District Court said debtor's attorneys file

6    objections to claims.  That is what they are paid handsomely to

7    do and they did that, and they eradicated it.  And as Judge

8    Mahoney states, creditors – I hate to use the word contemptor

9    but she uses it – in a 524 action can purge their contempt.  It

10    is in their hands and that is in the *Glenn v. Ocwen* case, and

11    Green Tree did purge that contempt by withdrawing the claim as

12    soon as it got notice.  And had they raised the issue of

13    attorney's fees in the objection, it could have been dealt with

14    by this court but, instead, they didn't and they let a final

15    order be entered and then took another shot.

16        I know that the court is a little more strict on the

17    contempt motions in light of the *Sims* opinion than they are on

18    the adversaries.  So they thought, well, let's take another

19    bite at the apple.  We are not saying we did no wrong.  We are

20    saying they haven't proven what we did.

21        They filed another adversary proceeding at the same

22    exact time as this one.  It was settled in August or July, two

23    thousand dollars.  They did not distinguish – it is their

24    burden to prove what stress we caused.  That claim was filed

25    for just a few thousand dollars less, eighty-six hundred versus

1  eleven thousand. It was not distinguished what stress was
2  caused by which claim.

3       It is the worse case scenario of time line of events.
4  Everything happened at once. A new baby, two claims, but they
5  were all dealt with – ours was dealt with six months before the
6  objection – the other lawsuit was settled. Our objection was
7  taken out in January. Our claim was done away with.

8       So if there is stress, their attorney was paid to
9  alleviate that stress. And it seems in their duty to mitigate,
10  if the court doesn't say that the objection has *res judicata*
11  effect, their duty to mitigate or the obligation to mitigate,
12  it seems that all of those fees that they are going to claim
13  ended with just the filing of the AP and the objection to claim
14  because the matter was resolved at that point.

15       I still stick to they have not distinguished – they
16  have proven that Mr. McLean suffers from emotional distress.
17  He has suffered from it for a long time but it was not
18  distinguished which lawsuit caused it. It wasn't distinguished
19  which claim caused it. They settled the other one for two
20  thousand dollars and our claim was taken out of their case
21  months before that.

22       That is all we have.

23       THE COURT: All right. Mr. Wooten, did you want to say
24  anything else or were you just getting up to leave?

25       MR. WOOTEN: Just very briefly, Your Honor. Paul and

1 I have had this philosophical discussion as colleagues about

2 this issue of *res judicata* and obviously I don't agree or else

3 I wouldn't have a case in the Eleventh Circuit on these issues

4 right now, and I don't think it is *res judicata* and here is

5 why:

6 The circuit courts that have spoken on this issue say

7 clearly that filing a claim is analogous to filing a lawsuit

8 against the debtor. It is not exactly the same but it is

9 analogous to, and you have two elements to that. You have

10 defensive actions, which are objections, and then you have

11 actions in the nature of setoff, which is any counterclaim

12 under Rule 15 that the debtor might have, and my position has

13 always been that, just like in truth-in-lending actions where

14 we have setoff claims against claims and any of the other

15 consumer protection acts that some other states have, when you

16 have a case like this where you have an objection, that is

17 nothing more than an affirmative defense to the claim. A

18 counterclaim is completely separate, and it is possible for the

19 party to prevail on both. You can prevail on an affirmative

20 defense just like in a federal district court lawsuit, win on

21 a statute of limitations defense and still bring your

22 counterclaim and get an affirmative recovery.

23 And so, you know, that is the way that I have seen the

24 circuit courts that have addressed it have analogized it, just

25 like we are here in an abbreviated lawsuit, and that is how I

1   have always perceived it in my practice and the way that we

2   have handled these adversaries and, as you know, we have had

3   hundreds over the years where we have brought claims in

4   bankruptcy court that otherwise, and maybe in the future will

5   be based on things that are developing with *Stern*, would have

6   to go to another court but, you know, until the *Stern* questions

7   came up, we brought pretty much any claim we had in this court

8   in the nature of setoff.

9          So that's why I don't think it's *res judicata*, plus

10  you always have that element of 502(j) which says that you can

11  review a ruling on a claim at any time and reconsider.  So it

12  is hard to say there is finality to something when you have a

13  specific code provision that says you can reconsider it at any

14  time.  In theory, you could reinstate their claim.  It is not

15  proper here but, in the appropriate case, you could do that.

16         So, you know, to have a final judgment that I think is

17  binding, I think you would have to have a final discharge order

18  in the case and the case be completely over before you could

19  have a final order that would be binding on that ruling to such

20  an effect that you would get *res judicata,* and that's the only

21  issue I wanted to make about that technical legal part.  I

22  think we have beat a dead horse on the other issues and I don't

23  want to repeat any of them.

24         THE COURT: All right.  Well, thank you gentlemen.  I

25  am going to take it under advisement and let you know.

1          MR. WOOTEN: Thank you, Your Honor.

2          MR. SPINA: Thank you.

3          (Off the record at 3:14 p.m.)

# C E R T I F I C A T E

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


 /s/ Patricia Basham

Patricia Basham, Transcriber

Date:  December 18, 2013